[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 935 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 936 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 937 
In the early morning hours of August 2, 1988, Karen Lane was savagely and brutally murdered in the apartment she shared with another young woman. In March 1989, Gregory Hunt, the appellant, was charged by a three-count indictment with the capital offenses of intentional murder during sexual abuse in the first degree, as defined in Ala. Code 1975, §13A-5-40(a)(8), and intentional murder during a burglary in the first degree, as defined in § 13A-5-40(a)(4).[1] On June 19, 1990, a jury found the appellant guilty of all three counts of the indictment and, by a vote of 11 to 1, recommended that punishment be fixed at death. On July 27, 1990, the trial judge sentenced the appellant to death. This is the direct appeal of that conviction and sentence.
This appeal was not submitted for decision until December 14, 1993. The delay in the submission of this appeal is largely attributable to the creation and completion of the record on appeal. The original record on appeal was filed on January 22, 1991. That record was supplemented on April 5, 1991; on December 26, 1991; on May 29, 1992; and on June 9, 1993. In addition, the appellant's trial counsel did not represent him on appeal. Out-of-state counsel filed notice of appearance on behalf of the appellant on February 19, 1991, but later withdrew. New counsel was appointed to represent the appellant on May 19, 1993. The appellant, through appointed counsel, filed his brief on October 1, 1993. The attorney general's brief was filed on December 10, 1993.
 I
The appellant complains that his constitutional rights were violated because he was denied access to a law library while he was incarcerated.
On October 11, 1989, the appellant, by written pro se motion, requested the circuit court to order the county sheriff "to give the Defendant being held on Capital charges access to complete law library for at least (4) four hours a week." R. 1000. It does not appear that the trial judge ever ruled on this motion.
On January 25, 1990, a pretrial hearing was held on pending motions. At that hearing, the appellant's attorneys moved to withdraw from representing the appellant on the grounds that the appellant had accused counsel of engaging in unethical conduct and because the appellant had acted "directly contrary to the advice" of counsel. R. 4, 101312. At that hearing, the appellant opposed the motion to withdraw and stated, "Well, I'm not here to represent myself." R. 9.
During the hearing, the following occurred:
 "MR. HUNT: . . . Being denied access to the law library has left me unable to prepare anything in my own behalf to present.
 "COURT: The way things are going, Mr. Hunt, if I gave you total access to the law library or you were housed in the law library, you would further screw your case up. You evidence an entire lack of ability to defend yourself by what you've done. I can't imagine anybody forcing Herbie Brewer or David Luker off of a case, off a criminal case. It's just unimaginable."
"MR. HUNT: Well, I know they are two good lawyers.
 "COURT: Well, they are two of the best criminal lawyers in the State of Alabama.
"MR. HUNT: I'm trying to keep them on my case." *Page 938 
 "COURT: Well, why are you filing all these things against their advice? . . ."
". . . .
 "MR. HUNT: [I do not know the law on discovery.] Not completely, no. I have not had access that would let me know the laws of the land. They have kept me up here for 18 months and I has asked them to get me to the law library or to have certain books that would let me know what discovery rules are and I haven't gotten any of it. I have mostly relied on my attorneys but —
 "COURT: Are you telling me that you intend to represent yourself? That's what you're telling me?
 "MR. HUNT: No, not at all. I just feel that my attorneys are working on so many cases that I might be able to help them out.
 "COURT: From the way you're talking I don't believe you could help anybody out in [a] running a stop sign case. It doesn't appear you have a grasp of any kind of law.
"MR. HUNT: I've had no schooling in law.
 "COURT: Obviously. It's quite clear to me that you haven't. And, you're setting yourself up to having another huge delay because you have caused your attorneys to withdraw.
 "MR. HUNT: That's what I'm asking you to prevent, any further delay.
 "COURT: You're amazing. . . . It's obvious to me that Mr. Hunt is a person of limited ability, in that he has no grasp of what he is talking about, whatsoever, no grasp." R. 10, 12-13, 14.
From this exchange, it is clear to this Court that the appellant was not seeking to exercise his right to represent himself, but was instead seeking to be allowed to act in the capacity of some sort of co-counsel.
" 'While a defendant has a Sixth Amendment right to be represented by counsel or to represent himself, . . . he does not have the right, under either the federal or state constitutions, to hybrid representation.' Christianson v.State, 601 So.2d 512, 519 (Ala.Cr.App. 1992)." Holland v. State,615 So.2d 1313, 1320 (Ala.Cr.App. 1993). " '[A]n individual does not have a right to hybrid representation. . . . Rather, the decision to permit a defendant to proceed as co-counsel rests in the sound discretion of the trial court.' Cross v. UnitedStates, 893 F.2d 1287, 1291-92 (11th Cir.), cert. denied,498 U.S. 849, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990)." Burks v.State, 600 So.2d 374, 380 (Ala.Cr.App. 1991). See also Whiteheadv. State, 593 So.2d 126, 129 (Ala.Cr.App. 1991); Ford v. State,515 So.2d 34, 43-44 (Ala.Cr.App. 1986), affirmed, 515 So.2d 48,51 (Ala. 1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061,98 L.Ed.2d 1023 (1988). "While prison officials must provide prisoners with direct legal assistance or access to a law library, they are not required to provide both, so long as the constitutional requirement of 'meaningful access' is met." Exparte Thigpen, 513 So.2d 101, 102 (Ala.Cr.App. 1987). We find no error in this regard.
 II
The appellant complains of numerous alleged errors in the prosecutor's comments and the presentation of certain evidence during the guilt phase of his trial concerning "other criminal acts."
After the jury had been selected but before the attorneys made their opening statements, defense counsel made an oral motion in limine, asking "the court to direct the state, at least in so far as opening statements are concerned, not to refer to any other offense other than the one we are concerned with, including the alleged arson." R. 216. The assistant district attorney responded: "This [the alleged arson] is so intertwined that there is no way to put testimony on about the killing without putting something on about what happened before. This was something that happened within hours of the killing." R. 217. The trial judge denied the motion in limine. R. 218.
The appellant complains of the following comments by the prosecutor in his opening statement to the jury:
 1) "[T]he defendant told her, 'I have taken the only thing that Karen had away from her tonight.' He told Debra K. Twilley that he had burned the house down." R. 223. *Page 939 
The trial court overruled defense counsel's objection. The prosecutor had earlier explained that the burning of the house, shortly before the murder, was part of the appellant's plan or scheme to harm the victim. R. 216-17.
 2) "Loretta will testify that he told her he wanted to get out of jail and wanted to escape and would she get him some money." R. 225.
The trial judge sustained defense counsel's objection.
 3) "We will show you a card, an identification card that he gave to Loretta while he was in jail." R. 226.
In response to the prosecutor's argument that he intended to prove "flight to avoid prosecution," the trial judge instructed the district attorney, "Let's don't do that, Charles. . . . That has nothing to do with the murder. I can go with the arson but that is taking it out a little far." R. 226. The trial judge then denied the appellant's request for a mistrial. R. 226-27.
 4) "His own sister will take this witness stand and tell you that he conveyed to her and testified to her that he, indeed, killed Karen Lane. That they were having an argument and that he had been drinking and that he had been taking some pills that he had gotten from a doctor and that they had been drinking and that he beat her or hit her and just lost his head." R. 224-25.
There was no objection to this comment.
The appellant complains of the following comments by the prosecutor in his guilt-phase closing argument to the jury:
 5) "She [the victim] and he had been seeing each other and had had a stormy relationship and he had been drinking that night and taking some type of drugs, prescription drugs, maybe non-prescription drugs." R. 848.
There was no objection to this comment.
 6) "James Sanders, the boy who testified from the jail, said he was taking cocaine. . . . He said he was using cocaine." R. 848-49.
There was no objection to these comments.
The appellant complains of the following incident which occurred during the prosecutor's direct examination of state's witness Loretta Martin:
 7) "Q. Did you have any conversation with him relevant to his drinking or anything?
 "A. Yes, I had asked him if he had been drinking and he said yes he was drinking and taking some medication that the doctor had prescribed for him." R. 279.
There was no objection at trial.
The appellant complains of the following incident, which occurred during the prosecutor's direct examination of state's witness Jamie Sanders:
8) "Q. Greg [the appellant] came to her apartment?
 "A. Right. To talk to her, you know, cause he said he was in love with her, to try to get her back and all. They had gotten in a fuss and he said he was on drugs, you know, that night.
"Q. Did he say what kind of drugs he was on?
"A. Cocaine." R. 602.
There was no objection.
We find no error in regard to each of these matters about which the appellant now complains. Evidence that the appellant burned the victim's house a short time before the murder was properly admitted. " 'In a prosecution for murder, evidence of former acts of hostility between the accused and the victim are admissible as tending to show malice, intent, and ill will on the part of the accused.' White v. State, 587 So.2d 1218, 1230
(Ala.Cr.App. 1990), affirmed, 587 So.2d 1236 (Ala. 1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992)."Childers v. State, 607 So.2d 350, 352 (Ala.Cr.App. 1992). "Acts of hostility, cruelty and abuse by the accused toward his homicide victim may be proved by the State for the purpose of showing motive and intent. . . . This is 'another of the primary exceptions to the general rule excluding evidence of other *Page 940 
crimes.' " Phelps v. State, 435 So.2d 158, 163
(Ala.Cr.App. 1983). See also Baker v. State, 441 So.2d 1061,1062 (Ala.Cr.App. 1983).
Evidence that the appellant had consumed either cocaine or prescription medication immediately before the murder was admissible on the issue of the appellant's mental state at the time of the crime and in an attempt to explain the appellant's conduct.
 "[H]ere it was 'entirely relevant and competent' to show that [the defendant] had been drinking or using drugs immediately prior to the time of the [offense]. . . . This is but a specific application of the general rule that 'antecedent circumstances tending to shed light on the transaction or elucidate the facts or show preparation to commit the crime are always admissible in evidence.' Ellis v. State, 244 Ala. 79, 86, 11 So.2d 861 (1943); Coats v. State, 253 Ala. 290, 296, 45 So.2d 35 (1950) (State properly allowed to show on cross examination of defense witness that shortly before shooting, defendant looked like he had been drinking since it shed light on mental condition of defendant at time he killed deceased). 'Immediately' is a relative term meaning 'without interval of time.' Mitchell v. State, 210 Ala. 457, 98 So. 285 (1923) (evidence that accused was continuously drunk for two weeks before murder admissible)."
Brown v. State, 492 So.2d 661, 663-64 (Ala.Cr.App. 1986).
In this case, the appellant's statements to others that he was "on drugs" tended to explain his conduct and were properly admitted into evidence.
 " 'In a prosecution for homicide, evidence of connected acts and transactions leading up to and explanatory of the killing is admissible. These acts and circumstances need not necessarily be a part of the res gestae, in a sense that they become a part of the crime itself, but they are admissible where they throw any light upon the acts, animus, or intent of the defendant, and in this case the mental attitude of the defendant at the time of the fatal difficulty as bearing on the question of freedom from fault. . . .' (Emphasis added.)"
Twilley v. State, 472 So.2d 1130, 1135 (Ala.Cr.App. 1985).
 III
The appellant complains that the district attorney made an improper comment regarding "plea bargaining" in his guilt-phase closing argument to the jury:
 "Now, there is another charge called simple murder, which is a much, much lower charge. It is a reduced charge or a lesser charge, that of what we call intentional murder or simple murder.
 "Mr. Wilkinson's [defense counsel] whole argument centered around why this is intentional murder and the reason is because that is a lesser charge. It is a reduced charge, sort of like a [district attorney] plea bargaining a case to reduce a charge." R. 854.
There was no objection to this comment at trial and the appellant cites no authority to support his objection raised now on appeal. Compare Jackson v. State, [Ms. CR-91-820, September 30, 1993] ___ So.2d ___ (Ala.Cr.App. 1993). We agree with the attorney general that the district attorney's comment was "merely an innocuous analogy that the prosecutor chose to use to help the jury understand the nature of some of Appellant Hunt's own evidence and arguments, evidence and arguments to the effect that there was no aggravating circumstance present in Appellant's case so as to convert to capital murder what would otherwise be merely an intentional murder." Appellee's brief at 9.
 IV
The appellant complains that the comments of the district attorney in his opening remarks to the jury at the beginning of trial constituted an improper expression of the prosecutor's personal opinion. In his opening statement, the district attorney stated:
 "The State is not here today to ask you to convict a man on flimsy evidence. It's not here today to ask you to convict a man on half-baked evidence. But, we are here today to tell you that the evidence that we will present, we feel, will be overwhelming and at the conclusion of this trial that you *Page 941 
will agree with the State of Alabama that the defendant is guilty of capital murder." R. 220.
There was no objection to these comments at trial. Our review of the record convinces us that the evidence against the appellant was, in fact, overwhelming. Consequently, there was nothing improper in the prosecutor's comments.
 "The purpose of an opening statement is merely to advise a jury of the issues involved in the case before them. Braswell v. State, Ala.Cr.App., 371 So.2d 992 (1979). It is a well-established rule that the scope and latitude of the opening statement are matters that rest within the sound discretion of the trial judge and his ruling should not be disturbed on appeal unless an abuse is shown. Winnings v. State, Ala.Cr.App., 370 So.2d 323, cert. denied, Ala., 370 So.2d 329 (1979)."
Brown v. State, 401 So.2d 213, 216 (Ala.Cr.App.), cert. denied,401 So.2d 218 (Ala. 1981).
 " 'The prosecution's opening statement to the jury on what it expects to prove should be confined to statements based on facts admissible in evidence. Counsel, however, is to be allowed considerable latitude in presenting to the jury in his opening statement what he expects the evidence to show.' White v. State, 294 Ala. 265, 270, 314 So.2d 857, cert. denied, White v. Alabama, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). ' "Counsel must restrict his opening statement to the issues of the case, and to the theory of the case as fixed by the pleadings, and although it is ground for reversal for him to call attention to collateral matters calculated to prejudice the jury, the fact that statements proper in themselves might also produce other collateral consequences harmful to the opposite party does not, if made in good faith, make the statements improper." * * * "Counsel, of course, may, in a reasonable way, outline what he expects to prove, unless it is manifest that such proof would be incompetent, or the offer or statement is made for the purpose of improperly influencing the jury." ' Daniels v. State, 243 Ala. 675, 679, 11 So.2d 756, cert. denied, Daniels v. Alabama, 319 U.S. 755, 63 S.Ct. 1168, 87 L.Ed [1708] (1943). ' "Counsel has no right, in his opening statement, to rehearse before the jury facts which he is not in a condition to prove." ' Handley v. State, 214 Ala. 172, 174, 106 So. 692 (1925). '[I]t is not contemplated that by the abuse of this privilege an attorney will inject into the proceedings immaterial and prejudicial matter.' Patterson v. State, 34 Ala. App. 359, 361, 39 So.2d 709 (1948)."
Lawson v. State, 476 So.2d 116, 119 (Ala.Cr.App.), cert. quashed, 476 So.2d 122 (Ala. 1985).
 " '[T]he rule on which the weight of authority is in agreement is that it is improper for the prosecuting attorney so to express his personal opinion or belief in guilt of accused as to permit of an inference by the jury that such opinion or belief is based on reasons or information outside the evidence, but that it is not improper for him to argue or to express his opinion that accused is guilty, where he states, or it is apparent, that such opinion is based solely on the evidence.' 23A C.J.S. Criminal Law § 1104, p. 194-95 (1961). See Crenshaw v. State, 153 Ala. 5, 7, 45 So. 631, 632
(1908) (prosecutor argued to the effect that the evidence showed a clear case); Cranmore v. State, 41 Ala. App. 276, 279, 129 So.2d 121, 123 (1961) (prosecutor's statement, 'I never did ask you to convict a man I believe to be innocent' found to be 'a mere expression of opinion by the solicitor that the defendant was guilty, and . . . not a cause for reversal'); Handley v. State, 214 Ala. 172, 175, 106 So. 692, 695 (1925) (argument, 'She is a murderer; she is a murderer. She is not some one who has committed some of the lower offenses of homicide' did 'not transcend the bounds of legitimate argument'); Gardner v. State, 17 Ala. App. 589, 590-91, 87 So. 885, 886, cert. denied, 205 Ala. 60, 87 So. 888 (1920) (prosecutor's argument that the defendant 'is a pickpocket' in prosecution for grand larceny 'was the expression of an opinion' by the prosecutor, 'and from the state's contention was supported by one phase of the evidence.' Presiding Judge Bricken dissented, arguing that 'it did not lie in the mouth of the solicitor to decide these vital *Page 942 
questions.'); McColston v. State, 20 Ala. App. 591, 593, 104 So. 347, 348-49 (1925) (prosecutor's argument, 'He is guilty of the crime of highway robbery,' should be refrained from but did not constitute error); Dunn v. State, 19 Ala. App. 576, 577, 99 So. 154, 155 (1924) (prosecutor's comment, 'I tell you that this defendant is guilty,' was merely an argument of the inference drawn by the solicitor and was not improper); Griggs v. State, 21 Ala. App. 530, 531, 109 So. 611 (1926) (prosecutor stated that from the evidence he believed the defendant was guilty, and that, if he did not believe the defendant was guilty, he would not ask the jury to convict him. Held: The opinion was based upon the evidence. 'Where this is the case, such expression of opinion will not be sufficient upon which to predicate a reversal.'); Tucker v. State, 28 Ala. App. 492, 494, 188 So. 276, 277 (1939) (prosecutor's statement, 'I believe he [defendant] is guilty' was a 'mere expression of opinion by the solicitor' and not improper remark); Gilbert v. State, 19 Ala. App. 104, 106-07, 95 So. 502, 504 (1923) (prosecutor's closing argument, 'He is guilty as hell itself under this testimony, and you know it' though not approved was 'but the mere expression of counsel made in argument')."
Galloway v. State, 484 So.2d 1199, 1201 (Ala.Cr.App. 1986).
Furthermore, any question about the propriety of this comment is removed by the district attorney's remarks at the conclusion of his argument:
 "What I've said is not evidence. Listen to what evidence the State puts on from the witness stand. I feel confident that based on the evidence, not on emotions and not on whim, but based on cold hard evidence and Walker County common horse sense. When you deliberate you will say — Yes, Mr. [District Attorney] we agree with you, not because we like you or don't dislike you, but based on the evidence that comes from the witness stand that the defendant is guilty as charged in the indictment of capital murder." R. 230 (emphasis added).
 V
The appellant complains of the following comments made by the prosecutor during his guilt-phase closing argument to the jury.
 "It's overwhelming. The man's guilt is overwhelming. . . . You're going to hear words such as 'reasonable doubt.' Ladies and gentlemen, this case is beyond reasonable doubt. It is well beyond that. It's overwhelming as to guilt. . . . Ladies and gentlemen, I close by saying [that] if this isn't capital murder, then there has never been capital murder in Walker County." R. 805.
There was no objection to these comments. Without any citation to authority, the appellant now claims that these comments "exceeded the guidelines for proper argument." Appellant's brief at 11. We reject this argument for the reasons stated in Part IV of this opinion. See Galloway, 484 So.2d at 1201.
 VI
We reject the appellant's contention that the prosecutor improperly vouched for the truthfulness of the State's witnesses when he stated in his closing argument during the guilt phase of the trial: "Everybody else has to be lying if you believe that Greg Hunt is not the guilty man." R. 849.
There was no objection to this comment at trial. Moreover, we find no impropriety in this comment.
 "A distinction must be made between an argument by the prosecutor personally vouching for a witness, thereby bolstering the credibility of the witness, and an argument concerning the credibility of a witness based upon the testimony presented at trial. '[P]rosecutors must avoid making personal guarantees as to the credibility of the state's witnesses.' Ex parte Parker, [610 So.2d 1181, 1187] (Ala. 1992). See Ex parte Waldrop, 459 So.2d 959, 961 (Ala. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).
 " ' "Attempts to bolster a witness by vouching for his credibility are normally improper and error." . . . The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in *Page 943 
the witness' credibility. . . . This test may be satisfied in two ways. First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity. . . . Secondly, a prosecutor may implicitly vouch for the witness' veracity by indicating that information not presented to the jury supports the testimony.'
 "United States v. Sims, 719 F.2d 375, 377 (11th Cir. 1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984).
 ". . . . 'The credibility of a witness is a legitimate subject of criticism and discussion.' Flint v. State, 370 So.2d 332, 335
(Ala.Cr.App. 1979). Here, as in Smith v. State, 344 So.2d 1239, 1242 (Ala.Cr.App.), cert. denied, 344 So.2d 1243 (Ala. 1977), '[t]he prosecutor's remarks were grounded on some testimony given by the witness himself.' See also Watson v. State, 398 So.2d 320, 328 (Ala.Cr.App. 1980), cert. denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981) (reference in closing argument to defendant as a 'bald face liar' was 'a hard blow but it was not foul')."
DeBruce v. State, 651 So.2d 599 (Ala.Cr.App. 1993).
 VII
The appellant argues that reversible error was committed when the prosecutor was permitted to suggest that a witness was not testifying truthfully.
Sometime prior to and relatively close to the time that the victim was murdered, the appellant used the telephone at the residence of Mrs. Jean Kilpatrick to make a telephone call. Mrs. Kilpatrick testified that while the appellant was talking on her telephone, she observed him writing on a pad of paper that was next to the telephone. She gave a sheet of that pad to the prosecutor. That sheet contained "some sketches of silhouettes of ladies and girls" and a telephone number. R. 563. A question was raised at trial as to whether the sketches had been done by the appellant or by Mrs. Kilpatrick's husband, who had died two months before the appellant's trial.
During the prosecutor's direct examination of Mrs. Kilpatrick, the following occurred:
 "Q. Okay. Now, there is some sketches of silhouettes of ladies and girls. I believe your husband liked to doodle and made those himself, you said . . .
"A. Yes.
 "Q. . . . and you don't attribute those to the defendant?
"A. No." R. 563.
During his closing argument in the guilt phase of the trial, the district attorney stated:
 "You heard from Mrs. Kilpatrick when she said Greg was writing on this. And, he was making some phone calls. You will have a stipulation in there that [the telephone number written on the sheet of paper] is the [telephone] number of patient information. And, Mrs. Kilpatrick does live in Cullman.
 "I submit to you, also, that she did say that these doodles on this thing were her husband's. Ladies and gentlemen, you saw that lady. She was an elderly lady. Do you believe any man the age that would be married to her and now deceased, would draw pictures such as this? You look at it. All the ink is all the same. No different color ink on here. The [telephone] number to the Walker Regional Medical Center and you have this picture." R. 798-99.
" 'The credibility of a witness is a legitimate subject of criticism and discussion.' . . . Here, . . . '[t]he prosecutor's remarks were grounded on some testimony given by the witness himself.' " DeBruce, 651 So.2d at 611. The prosecutor's opinion was based on the evidence presented at trial and the logical inferences to be drawn therefrom.
 VIII
The appellant contends that the prosecutor improperly commented on the fact that he did not testify.
In the rebuttal portion of his closing argument to the jury during the guilt phase of the trial, the district attorney stated: *Page 944 
 "So, we all know, and the evidence that has been presented is uncontroverted that this is the left bloody palm print of Greg Hunt. Well, nobody in the courtroom that don't believe that he had a bloody hand [sic]. Ain't nobody in that courtroom that don't believe [sic] that he touched that stair because the defense even admitted that in their opening statement."
 ". . . [After describing the pockets of the bloodied pants found at the scene, the prosecutor continued:] So, I said, 'Is there anything on the right hand side of those pockets that this jury might be interested in knowing, that nobody has told them about?' This is in evidence, so I said, 'Well, is there anything on the inside?'
 "What about Greg Hunt's left hand? I know if these are his pants and if he has a bloody left hand, that left pocket might be significant. Mr. Taylor [defense counsel] made the challenge. He made the challenge." R. 846-47.
Not recited by the appellant in his brief on appeal are the comments of the prosecutor which follow those quoted above:
 "I want you to remember the testimony that came from the witness stand that he left that bloody palm print up there and I want you to look at Mr. Taylor's challenge that has been answered, the 29, 30 [inch waist] pants that his own momma said he could wear. They have blood in the left hand pocket and how can you explain blood being in the only pair of men's pants that was found in there, that is the same size that this man wears, unless he put his hand in his pocket?
 "So, who [do] the clothes belong to? Mr. Taylor said, 'If you find out who those pants belong to, you've got the man.' All the other evidence put aside, we've got our man. And, that's the man. . ..
 ". . . . He had a bloody left hand and he stuck it in that pocket to get the blood off his hands, like Pharaoh tried to wash his hands. He tried to get his blood off by putting it in his pocket and he left it in the pants the same size that he wears and he had these socks on.
 "That's why we didn't find any shoe prints or footprints down there." R. 84748.
The prosecutor's statements were reasonable inferences from the evidence and were in direct response[2] to defense counsel's closing argument, in which defense counsel stated:
 "Now let's get back to the fingerprint. Fingerprint on the window. Fingerprint on the steps. Blood on it. Yes, Greg Hunt was there on that occasion. He found the body. There was blood everywhere; living room, kitchen, upstairs. Certainly he could have gotten blood on his hand there looking at the body, whatever, he did.
 ". . . But, the question is this: How about those other eight or nine fingerprints that were matched against Greg Hunt that were not his? . . .
 "If Greg Hunt was there, which he admits, at 2:44, somebody else was in that house, too."
". . . .
 "And, the greatest evidence in this case with regard to the innocence of Greg Hunt, the clothing. Why did not the State of Alabama in presenting their case show you the broom, show you the stool but did not want to show you those other bloody items?
". . . .
 "Ladies and gentlemen of the jury, whoever killed Karen Lane on that brutal night was wearing those clothes. That's the only way you can explain the presence of the blood. . . .
 "You can not tell me under God's sun, that the State of Alabama made no attempt to find out who that clothing belonged to. Yeah, they found out. You know what it showed. It wasn't Greg Hunt.
 "They already had enough problems with the fingerprints. They already had *Page 945 
enough problems with the hair. Now, they have to admit that the clothes don't belong to him. No case.
". . . .
 "I can assure you if it belonged to Greg Hunt, they would have told you. They have ways of finding that out. Fiber tested, clothing tested. Don't you know they asked Tina Gilliland who owned that apartment, 'Who are these men's clothes?' Don't you know they made every effort to try to connect those clothes to Greg Hunt? They couldn't do it.
". . . .
 "I challenge Mr. Baker right here on the spot, when he gets up here to tell you why he made no attempt to find out who that other bloody clothing belonging to a male belonged to. 'Oh, the men's pants belonged to a boy.' That is what Mr. Vaughn told him.
". . . .
 "They checked that out. They checked it out thoroughly. They knew if they could pin those bloody clothes on this young man that would seal their case. But, they couldn't.
 "That's why he didn't tell you anything when they presented their case. That's why they say now, 'We didn't really try to find out who they belonged to.' Sure they did. If they belonged to Greg Hunt they would have told you." R. 813, 815-18.
No statement made by the district attorney constituted a comment on the appellant's failure to testify.
 " 'During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' Rutledge v. State, 523 So.2d 1087, 1100
(Ala.Cr.App. 1987), rev'd on other grounds, 523 So.2d 1118 (Ala. 1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). 'In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, . . . each case must be judged on its own merits,' Hooks v. State, 534 So.2d 329, 354
(Ala.Cr.App. 1987), aff'd, 534 So.2d 371 (Ala. 1989), cert. denied, 488 U.S. 1050 [109 S.Ct. 883, 102 L.Ed.2d 1005] (1989) (citations omitted) (quoting Barnett v. State, 52 Ala. App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr.App. 1990), aff'd, 590 So.2d 369 (Ala. 1991)."
Coral v. State, 628 So.2d 954 (Ala.Cr.App. 1992), affirmed,628 So.2d 1004 (Ala. 1993). "A prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel. See Ex parte Rutledge, 482 So.2d 1262, 1264
(Ala. 1984)." DeBruce v. State, 651 So.2d 599, 609
(Ala.Cr.App. 1993).
 IX
The appellant claims that the trial court committed reversible error in allowing the prosecutor to comment on facts in evidence for no reason other than to inflame the passions of the jury.
James Sanders testified as a witness for the State. At the time of trial, he was "residing" in the Walker County jail. He had prior criminal convictions for receiving stolen property and robbery. He testified that while he and the appellant were in the same cell in the county jail, the appellant told him that he had been on cocaine when he murdered his girlfriend:
 "He [appellant] said they were fussing and he was jealous and they were fussing over the guy she had been seeing and they got in a fight and he knocked her down and went into a rage because he was messed up on dope and started kicking her and abusing her and choking her — . . . And, said that when she was laying on the ground he told her if she had to have one all the time he would give her one and he struck [sic] the broom handle between her legs. . . . He said she was bleeding and he got scared and called the police. . . ." R. 614.
In his closing argument to the jury defense counsel Taylor stated: "How much credence can you pay to a jail inmate? Is it logical to you that Greg Hunt, on the day before he goes to trial for his life would go up there in *Page 946 
that jail and tell some inmate that he had done this horrible thing? Is that logical?" R. 820. In his closing argument, defense counsel Wilkinson stated: "I submit to you that he was expecting some [help] and it's too obvious and when he says he doesn't I think he's lying and when he lies, he lies under oath and perjures himself. . . ." R. 833.
In his closing argument to the jury at the guilt phase of the trial, the district attorney explained to the jury why the State used Sanders as a prosecution witness:
 "He [Sanders] said [the appellant] was using cocaine. Then [the defense] jumped all over the state for putting him on the witness stand.
 "But, I can tell you this, ladies and gentlemen of the jury, when you are trying the devil, sometimes your witnesses have to come from hell." R. 849.
The trial judge overruled defense counsel's objection that this comment was "inflammatory and improper argument." R. 849.
We find no impropriety in the prosecutor's comment that "when you are trying the devil, sometimes your witnesses have to come from hell." "In a proper case, the prosecuting attorney may characterize the accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence of the case." Nicks v. State, 521 So.2d 1018,1023 (Ala.Cr.App. 1987), affirmed, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988). See also Barbee v. State, 395 So.2d 1128, 1134-35
(Ala.Cr.App. 1981). In this case, the prosecutor's characterization of the appellant as a "devil" was completely justified by the evidence of the manner in which the appellant murdered Ms. Lane.
We quote that portion of the sentencing order in which the trial judge found the existence of the aggravating circumstance that the capital offense was especially heinous, atrocious or cruel when compared to other capital offenses:
 "A. The Court finds from the testimony of Dr. Joseph Embry of the Alabama Department of Forensic Sciences, [that] Ms. Lane sustained a total of 60 injuries which included: 20 injuries to the head; 12 fractured ribs on the left side and 12 fractured ribs on the right side; her breast bone was fractured; she sustained bruises to her heart; three tears to her liver; bruises to the lung; three-quarter-inch-tear to the aorta; bruised pancreas and bleeding in the muscles to the side of the neck.
 "B. The Court finds from the evidence adduced by the State in the combined testimony of several witnesses establishing the fact that Mr. Hunt did insert a broomstick into the vagina of Ms. Lane during the assault which led to her death and that at some time in close proximity to her death he ejaculated in her mouth. (See State's exhibit 2.)
 "The Court finds that these injuries were designed to inflict a high degree of pain and terror, with an utter indifference to — or even enjoyment of — the suffering of the deceased.
 "This Court recognizes that all capital offenses are 'heinous, atrocious or cruel,' to some extent.
 "Evidence that the victim suffered over a protracted period of time is established by blood being found throughout the apartment in the upstairs bedrooms, on the staircase, in the living room and ultimately in the kitchen where the body was found. Also that the bar stool was the principal instrument of death.
 "Because of the shockingly inhumane manner in which the defendant beat the deceased, thereby causing so many injuries, the Court finds that these acts were committed in such a manner and over a period of time that undoubtedly inflicted an extreme degree of pain, suffering and terror on a helpless victim.
 "The Court is therefore convinced beyond a reasonable doubt that this aggravating circumstance exists and that in comparison with other capital offenses tried before this Court over a period of fourteen years, the degree of heinousness, atrociousness, and cruelty which characterizes this crime far exceeds that common to the capital offenses tried before this Court." R. 1047-48. *Page 947 
The appellant further complains of the following argument made by the district attorney as part of his closing argument to the jury:
 "And there was a bottle of vaseline found by the body. There is a broom stick and she is lying there and she is bleeding and she can't move. . ..
 "And, he said, 'Bitch, if you want one I'll give you one, Bitch.' And, he takes this broom stick and I don't know if he put that vaseline on this broom stick or not but I suggest to you that it was found right there laying close to her and he might have greased this broom stick up and was using it as a phallic symbol. She is laying there, God, she is beat to a pulp and he takes this broom stick and I suggest to you that evidence is none other than that he put it four inches deep in her vagina, to her cervix and the mucus secreted by the cervix is on it." R. 861.
The appellant argues that there was no evidence that the broom stick was coated with vaseline or that the stick had been used as a "phallic symbol." While the district attorney's comments are graphic and nauseating, they constitute legitimate and reasonable inferences based on the evidence presented to the jury of the manner in which the victim was murdered.
 X
The appellant contends that the prosecutor improperly argued facts not in evidence. The appellant argues that there was no evidence to show that the blood on the pants was the victim's or "even if the blood was human." Appellant's brief at 16.
In his closing argument to the jury at the guilt phase of the trial, in arguing that the pants found at the scene of the crime belonged to the appellant, the district attorney stated:
 "I suggest to you that these are the defendant's pants. But, I've discovered something about these pants that I haven't told you about. I've discovered something that I think is remarkable. I've discovered something that is going to answer Mr. Taylor's challenge." R. 845.
The district attorney then argued that a bloody print of the appellant's left hand had been discovered at the scene of the crime, and that if the jury would "get in the jury room and . . . look at the pants," they would find "blood in the left hand pocket." R. 847. There was no objection to this argument at trial.
Here, there was undisputed evidence that a bloody palm print of the appellant's left hand was found at the scene of the crime. There was also evidence that a pair of men's pants were found at the scene of the crime, that there was blood everywhere, that the men's pants were covered with blood and had blood in the left pocket, and that the pants were of a size that could have been worn by the appellant. The prosecutor's comment was a legitimate inference from the evidence. "A prosecutor may state or comment on proper inferences from the evidence and may draw conclusions from the evidence, based upon his own reasoning. Sasser v. State, 494 So.2d 857
(Ala.Cr.App. 1986)." Bui v. State, 551 So.2d 1094, 1109
(Ala.Cr.App. 1988), affirmed, 551 So.2d 1125 (Ala. 1989), vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712
(1991).
 XI
The appellant contends that there was no affidavit in support of the warrant for his arrest issued on August 2, 1988. He also alleges that the arrest warrant was issued without a hearing before a magistrate. He claims that, consequently, his arrest on August 3, 1988, was unlawful, and that the evidence obtained by the State as a result of his incarceration should not have been used against him at trial.
There is nothing in the record on appeal to indicate that this issue was raised in either the district or circuit court. Because there is nothing in the record to indicate that the appellant was arrested without probable cause, the alleged error is not "plain." See McNair v. State, 653 So.2d 320
(Ala.Cr.App. 1992). Moreover, record does indicate that there was probable cause for the appellant's arrest and that his arrest was pursuant to a warrant. *Page 948 
Karen Lane was murdered on August 2, 1988. The writ of arrest charging the appellant with arson in the second degree and with murder was issued by the district court on August 2, 1988. That writ of arrest was based upon the complaint of Investigator John Mark Tirey of the Walker County Sheriff Department. R. 960. That complaint states, in part: "Before me, Larry Lapkovitch, Judge of District Court . . ., personally appeared Investigator John Mark Tirey, Walker County Sheriff Department." R. 960. The form titled "Complaint and Warrant of Arrest" lists four witnesses: "John M. Tirey, Walker Co. Sheriff," "J.C. Poe, Jr., Walker Co. Sheriff," "Jack Lawson Walker, Co. Sheriff," "John M. Vaughn Walker, Co. D.A." R. 961. The arrest warrant was executed on August 3, 1988. R. 961. The appellant was indicted on March 27, 1989.
Investigator Tirey obtained a search warrant for the appellant's motor vehicle on August 3, 1988. R. 1150, 1152-54. Tirey's affidavit in support of the search warrant is contained in the original record. R. 1150, 1152. Tirey's statements in that affidavit clearly show that probable cause existed for the appellant's arrest.
The transcripts of the preliminary hearing held in district court on August 19, 1988, and of the hearing on a petition for writ of habeas corpus (for reduction of bond) are also contained in the record on appeal. Volume I of the Supplemental Record filed May 29, 1992. The record of these proceedings convinces this Court that there was clearly probable cause for the appellant's arrest.
 XII
The appellant contends that the record does not reflect that he was present at certain proceedings.
1. The appellant contends that the record does not show that he was present at a hearing on a motion to dismiss a juror because the juror suffered from a hearing impairment. R. 396. This issue was not raised in the circuit court. Moreover, the appellant's allegation is not supported by the record.
The record does reflect that immediately before the trial judge relocated the proceedings from the trial courtroom to another courtroom to question the hearing-impaired juror, the judge stated:
 "I don't want to embarrass the man by having a whole bunch of people in here and bringing him in here. But, of course, you all certainly need to be with me when I talk to him. The court reporter, myself and one attorney and the defendant needs to talk with him." R. 392 (emphasis added).
From this statement, it appears that the trial judge was very aware that the appellant should be present at the hearing.
 " 'Where the record on appeal is silent, it will be presumed that what ought to have been done was not only done, but was rightly done.' Watson v. State, 398 So.2d 320 (Ala.Cr.App. 1980), cert. denied, 398 So.2d 332 (Ala.), cert. denied, Watson v. Alabama, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981). See Watts v. State, . . . 460 So.2d 204 (Ala. 1983) ('(S)ilence at trial constitutes a waiver of arraignment.'); Marsden v. State, [475 So.2d 588] (Ala. 1984) (Defendant waived arraignment 'by pronouncing his readiness to proceed with trial and maintaining silence thereafter.'). 'A reviewing court cannot predicate error on matters not shown by the record. . . . Indeed, a silent record supports a judgment.' Robinson v. State, 444 So.2d 884, 885 (Ala. 1983)."
Smith v. State, 471 So.2d 501, 503 (Ala.Cr.App. 1984) (Bowen, P.J., dissenting), overruled on other grounds, Nichols v.State, 629 So.2d 51 (Ala.Cr.App. 1993).
2. The appellant contends that "there is no record of a hearing, nor was he ever provided a record for his appeal, of [a] particular hearing, [in] which . . . some trial strategy or action on the part of the defense counsel and the court occurr[ed] during the course of the trial." Appellant's brief at 19-20. The basis for this contention appears in the following comments, which were made after the testimony of a witness for the prosecution:
 "MR. BAKER [district attorney]: Judge, at this time and subject to change, I expect *Page 949 
to put on, today, one or two more witnesses at most and have two witnesses to put on tomorrow morning. I would expect to rest at that time but —
 "COURT: How long do you expect these two tomorrow to last?
 "MR. BAKER: I would say no more than 30 minutes each. I just thought I would let everybody know that.
 "COURT: I have some very heavy legal issues that I need to resolve in my own mind. I need help from you all on it.
 "MR. WILKINSON [defense counsel]: We will need to present it for the record, no matter which way we decide to go.
"JURY IN
 "COURT: Ladies and gentlemen, I've been informed that we will probably finish Monday or Tuesday. Things have been cut a lot shorter. This delay here was probably not a delay but saved us some time. We got some things accomplished that we needed to." R. 579-80 (emphasis added).
Defense counsel then continued his cross-examination of the state's witness.
Contrary to the appellant's contention, and although there is some ambiguity in the record on this matter, the record does not show that a hearing was held on those "very heavy legal issues" involving "trial strategy" at that time. The record does show that shortly after the prosecution rested its case-in-chief (R. 639), a hearing was held involving "legal issues." R. 640-49.
3. The appellant also claims that he was not personally present during an alleged hearing concerning jury separation. The basis for this argument is found in the following comment of the trial judge:
 "Defendant and his counsel have indicated that the jurors can visit with their families on a monitored basis on Sunday. Also, the jury will be sequestered at a juror's house at the lake on Sunday morning. They will go to the lake and maybe pontoon around — without anybody else there." R. 623.
This comment was made in open court and there was no objection. Applying the principles we have set out above, we find no error in this regard.
Furthermore, with regard to each of the three alleged instances of the appellant's absence, we note that there has been no demonstration that the appellant, if he were absent, was absent from a "critical stage" of the proceedings. SeeHarris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), affirmed,632 So.2d 543 (Ala. 1993); McMillian v. State, 594 So.2d 1253
(Ala.Cr.App. 1991), remanded on other grounds, 594 So.2d 1288
(Ala. 1992).
 XIII
The appellant argues that the trial court committed reversible error in "amending" the indictment to correct an improper statement.
Count III of the indictment charged, in pertinent part, that the appellant:
 "did intentionally cause the death of Karen Lane by striking her with his hands . . . and said Greg Hunt caused said death during the time that Greg Hunt knowingly and unlawfully entered or remained [in] . . . the dwelling house of Tina Gilliland, . . . lawfully occupied by Karen Lane, with the intent to commit sexual abuse, 2d degree, a felony, therein, in violation of the Code of Alabama 1975, § 13A-5-40(a)(4). . . ." R. 964 (emphasis added).
In his oral instructions to the jury, the trial judge stated:
 "Count III of the indictment . . . [states] 'with the intent to commit sexual abuse, in the second degree, a felony,' and that's incorrectly stated, it should be a misdemeanor. . . ." R. 889-90.
At the conclusion of the trial judge's instructions, defense counsel "move[d] to dismiss Count III of the indictment on the grounds that the charges allege felony and sexual abuse in the second degree is a misdemeanor." R. 898. Defense counsel also stated other grounds for the dismissal of Count III. In response to those objections, the trial judge instructed the jury to "disregard everything I've said about Count III" (R. 899) and he recharged the jury on the crime charged in Count III. At the conclusion of *Page 950 
those instructions, defense counsel stated: "We want to reaffirm our motion to dismiss Count III of the indictment on grounds that the indictment states it's a felony when in fact the offense of sexual abuse in the second degree is a misdemeanor." R. 906.
As the trial court explained to the jury, Count III incorrectly stated that sexual abuse in the second degree is a felony — sexual abuse in the second degree is a Class A misdemeanor. Ala. Code 1975, § 13A-6-67(b). However, this misdesignation in the indictment was not fatal.
Section 13A-5-40(a)(4), Ala. Code 1975, makes capital the offense of "[m]urder by the defendant during a burglary in the first or second degree or an attempt thereof committed by the defendant." Burglary in the first degree is defined in §13A-7-5(a) as follows:
 "A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in dwelling . . ., he or another participant in the crime: (1) [i]s armed with explosives or a deadly weapon; or (2) [c]auses physical injury to any person who is not a participant in the crime. . . ."
(Emphasis added.) It is clearly immaterial under § 13A-7-5(a) whether the crime the accused intended to commit in the dwelling is a felony or misdemeanor.
Count III tracked the pertinent parts of § 13A-5-40(a)(4) and § 13A-7-5(a) and clearly charged the appellant with the capital offense of murder during a burglary in the first degree. It was sufficient that, with regard to the elements of the burglary, Count III alleged that the crime the appellant intended to commit was sexual abuse in the second degree. The classification of that offense as a felony, while erroneous, was mere surplusage.
 " 'The rule in our State is that an allegation in an indictment which is but mere surplusage may be disregarded — it is immaterial for any purpose. The exception to this rule — which does not occur in this case — is that if the allegation (constituting surplusage) "is descriptive of the fact or degree of the crime, or is material to the jurisdiction" it must be proved as alleged. See McGehee v. State, 52 Ala. 224 [(1875)].' Brown v. State, 30 Ala. App. 339, 343, 7 So.2d 24 (1941) (emphasis in original)."
McCall v. State, 501 So.2d 496, 507 (Ala.Cr.App. 1986).
Additionally, we see no difference in the misclassification of sexual abuse in the second degree as a felony and the miscitation of a code section. "Miscitation of a code section does not void an indictment which otherwise states an offense; and, in the absence of a showing of actual prejudice to the defendant, reference to the erroneous code section will be treated as mere surplusage." Ex parte Bush, 431 So.2d 563, 564
(Ala. 1983), cert. denied, 464 U.S. 865, 104 S.Ct. 200,78 L.Ed.2d 175 (1983).
 XIV
The appellant argues that Ala. Code 1975, § 13A-5-40(a)(8) is unconstitutional because sexual abuse in the second degree is a misdemeanor and "[i]ntentional murder during the commission of an underlying misdemeanor would not invoke the capital murder statute." Appellant's brief at 21.
The appellant's argument is based on the definition of "during" contained in § 13A-5-39(2): "DURING. The term as used in section 13A-5-40(a) means in the course of or in connection with the commission of, or in immediate flight from the commission of the underlying felony or attempt thereof." (Emphasis added.) In effect, the appellant argues that the aggravating component of a capital crime must be a felony. We reject this argument.
In Alabama, a capital offense consists of an intentional murder accompanied by an aggravating component. See J. Colquitt, The Death Penalty Laws of Alabama, 33 Ala.L.Rev. 213, 235 (1982). The aggravating component of each capital offensemay be another felony: kidnapping in the first degree, robbery in the first degree, rape or sodomy in the first or second degree, burglary in first or second degree, sexual abuse in the first degree, arson in the first or second *Page 951 
degree, aircraft hijacking, and a previous intentional killing. § 13A-5-40(a)(1), (2), (3), (4), (8), (9), (12), (13). However, for certain capital offenses, the aggravating component does not involve the commission of a felony. In some cases, the aggravating component is the nature of the victim: law enforcement officer, public official, witness, child less than 14 years of age, § 13A-5-40(a)(5), (11), (14), (15). In other cases, the aggravating component is the nature of the defendant: murder while the defendant is under a sentence of life imprisonment or murder for hire, § 13A-5-40(a)(6), (7); or the aggravating component is the particular manner in which the victim was killed: murder by means of explosives, murder of two or more persons by one act, victim is killed while in a dwelling or in a motor vehicle by a deadly weapon fired from outside that dwelling or motor vehicle, victim is killed by a deadly weapon fired from a motor vehicle. § 13A-5-40(a)(9), (10), (16), (17), (18). In one case, the legislature has provided that the aggravating component may be a misdemeanor: murder during sexual abuse in the second degree. §13A-5-40(a)(8).
There is no constitutional or statutory requirement in this state that the aggravating component of a capital murder be a felony, or that it even be a crime. "The power to define crime and fix the punishment for the commission thereof rests with the legislative department of government." Woco Pep Co. ofMontgomery v. City of Montgomery, 213 Ala. 452, 454,105 So. 214, 215 (1925). See Ex parte Woodard, 631 So.2d 1065
(Ala.Cr.App. 1993).
Moreover, the appellant's argument is not supported by the facts of this case. The aggravating component of the capital offense charged in Court I of the indictment was sexual abuse in the first degree in violation of § 13A-6-66(a)(2) (sexual abuse where the victim lacks the capacity to consent). The aggravating component of the capital offense charged in Count II of the indictment is sexual abuse in the first degree, in violation of § 13A-6-66(a)(1) (sexual abuse involving forcible compulsion). Sexual abuse in the first degree is a Class C felony. § 13A-6-66(b).
The aggravating component of the capital offense charged in Court III of the indictment is burglary in the first degree in violation of § 13A-7-5(a)(2). The allegation of sexual abuse in the second degree in Court III was to supply the intent with which the burglary was committed. Count III did not allege an intentional killing during the commission of sexual abuse in the second degree.
 XV
In an argument consuming approximately two pages of his brief (Appellant's brief at 23-25), the appellant contends that the record on appeal is incomplete.
The following are the information or documents that the appellant asserts are missing from the record on appeal together with the finding of this Court as to each piece of information or document.
1. "[T]he organization of the venire for the petit jury." The jury venire list appears in Supplemental Record filed on April 5, 1991, at 14-15.
2. "[T]he organization of the regular juries for the week or term at which the case was tried." This information is not contained in the record on appeal. However, we are not aware of any requirement that the record contain this information.
3. "[A]ll other official jury data." This "data" is not specifically identified, and there is no indication that such data exists or has ever been compiled.
4. "[A]ll jury questionnaires." There is no indication that jury questionnaires ever existed.
5. "[A]ll jury data sheets." There is no indication that jury data sheets ever existed.
6. "[A]ll voir dire questions requested; a transcript of all voir dire proceedings including motions to strike for cause and rulings on such motions; a transcription of the actual striking of the jury; a transcription of all objections and hearings regarding any peremptory strikes allegedly exercised in a racially discriminatory manner; all trial court rulings on motions regarding the exercise of *Page 952 
peremptory challenges pertaining to racial discrimination."
The jury selection process, including voir dire of the jury venire, is contained in the record on appeal. R. 64-205. The record shows that the initial venire consisted of 57 persons, and that 41 veniremembers remained after the challenges for cause and excuses had been granted. R. 202. The record shows that the trial judge excused eight veniremembers. R. 68-72. The record also contains the challenges for cause exercised by the attorneys for both the State and the appellant. See R. 168-69, 175, 178, 179-85.
The strike sheet indicates which party struck which veniremember. Supplemental Record filed April 5, 1991, at 14-15. That strike sheet contains no indication of the race of any veniremember. The trial court placed the burden on appellant's counsel in this regard and informed counsel: "What I'll let you do is get the names. These names are taken from a master driver's list in Montgomery which would reflect their race, their driver's license would. Any order that I need to enter to help you along that line, I will do it." Appellant's counsel responded, "That's fine, Judge." Supplemental Record filed December 26, 1991, at 17 (transcript of September 4, 1991, hearing).
The record shows that there was no objection made pursuant toBatson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69
(1986), and Ex parte Branch, 526 So.2d 609 (Ala. 1987). Defense counsel did object that "only five blacks were impaneled on this jury venire which violates mandatory cross section balance required by the Supreme Court decision." R. 202. At a hearing on September 4, 1991, the assistant district attorney stated: "I think there was one black on the panel. Walker County is seven to seven and a half percent black. This breaks down to eight percent on the jury. I think there was one black on the panel." Supplemental Record filed December 26, 1991, at 16 (transcript of September 4, 1991, hearing).
The record does not reflect the actual striking of the jury, but does reflect the following:
 "COURT [to the jury venire after voir dire]: The striking will take place between the attorneys and the clerk. If there are additional questions that need to be asked they will notify me and I will call you back to order and ask the question." R. 204.
Additionally, the appellant contends that the following are missing from the record on appeal:
1. "[R]ulings on the appellant's motion on the change of venire." We assume that this refers to the motion for a change of venue. That motion for change of venue is found at R. 994. That motion is not verified and is not supported by affidavits or exhibits. While no ruling appears in the record, it is obvious that the motion was denied.
2. "[I]tems [the court] stated it would [provide] at the hearing to supplement the record that occurred on September 4, 1991." These "items" are not more particularity described in the appellant's brief.
3. "[T]he affirmation of probable cause to issue warrant of arrest." When appellant's counsel requested the affidavit in support of the warrant of arrest he stated, "I do not have and I do not know for a fact whether or not there was an affidavit submitted to this court in support of an arrest issued for Mr. Hunt." The trial judge responded: "No, I wouldn't think so." Supplemental Record filed December 26, 1991, at 18 (transcript of September 4, 1991, hearing). While the record contains no affidavit in support of the warrant of arrest, the record does contain a transcript of the preliminary hearing held in district court on August 19, 1988. See Volume I of the Supplemental Record filed May 29, 1992. See also the transcript of the hearing in circuit court on the appellant's petition for writ of habeas corpus (seeking a reduction of bond) held on September 5, 1989, which is located at Volume I of the Supplemental Record filed May 29, 1992.
At the hearing on September 4, 1991, Stanley L. Cohen, appellant's then appellate counsel, stated: "If there were any sworn averments, any supporting documents, any affirmations whatsoever, I ask that be certified into the record as well." The trial judge responded: "I would say, without any question, *Page 953 
that there would not be. It is not our practice to do that here." Supplemental Record filed December 26, 1991, at 22 (transcript of September 4, 1991, hearing). We have also addressed this issue in Part XI of this opinion.
4. "[C]ase action summary sheets of the witness, Jamie Carr Sanders." The record reflects that almost all of Volume II of the Supplemental Record filed in this Court on May 29, 1992, consists of court documents and records, including case action summaries, relating to this witness.
5. "[V]oir dire of jurist who separated after order of sequestration." Unless this "jurist" is one of those jurors taken to the hospital, and discussed in subpart 11 below, absolutely no additional information has been provided by the appellant regarding this allegation.
6. "[H]earing that states that all parties agree to the jurists going boating and visiting with family members at a jurist's house." In this regard, the record reflects that during the course of the trial, on Saturday morning, June 16, 1990, in open court before the first witness was called, at the very beginning of the proceedings in the record, the trial judge stated:
 "COURT: Defendant and his counsel have indicated that the jurors can visit with their families on a monitored basis on Sunday. Also, the jury will be sequestered at a juror's house at the lake on Sunday morning. They will go to the lake and maybe pontoon around — without anybody else there." R. 623.
The jury was then brought into the courtroom and the trial judge instructed the jurors on their conduct in this regard. R. 623. There was no comment by counsel for either party.
7. "[N]othing showing why the appellant was not present at the voir dire of a jurist released for hearing impairment (R. 391-94)." The record reflects that the trial judge questioned the hearing impaired juror in the presence of all parties. At the conclusion of the judge's questioning, the trial judge stated that he was going to dismiss that juror and then stated: "The record will reflect that I made a note as to who alternate # 1 and # 2 was and in front of all parties, I am going to slide alternate # 1 into that position." R. 396 (emphasis added).
8. "[T]he hearing that occurred during the trial at which it appears that a change of trial strategy occurred in which the appellant was not present." Apparently, the appellant is making a reference to R. 579-80, which this Court addressed in Part XII.2 of this opinion.
9. "[T]he complete file on the appellant (investigators' file and discovery file)." In this regard, the record reveals the following:
 "BY MR. COHEN [appellant's then counsel on appeal]: Okay. Also, Judge, there is — We don't have a complete file. I realize this is not something that the court oversees and unfortunately, one of Mr. Hunt's counsel is deceased and the other counsel we've had some problems communicating with. We will again try to resolve it. Obviously, the discovery material which was turned over is part of the record.
 "Now, eventually, we may have a situation where we will need, again, some period down the road, to sit down with materials that Mr. Wilkinson [trial counsel] says he had and compare with materials that you possess to see if, in theory, anything should have been provided and was not.
 "It may be easier at this point, if we can get going on this.
 "BY THE COURT: As I recall, everything that was requested was provided with the exception and maybe even including, investigator's notes.
 "BY MR. ADAIR [assistant district attorney]: Everything was.
 "BY THE COURT: There was a meeting in my office where everything was, or a copy of everything, was given to defense attorneys and they checked it off the list and everybody signed that list. Did you all find that?
"BY MR. COHEN: Yeah, we do have that.
"BY THE COURT: Okay.
 "BY MR. COHEN: The problem that we really have at this point is, other than some statements perhaps a half-inch thick, *Page 954 
which was a number of witnesses who testified at trial as well as some who did not, we are lacking — There was obviously a voluminous amount of material turned over. So, what I would request, given the fact that Mr. Taylor [trial counsel] is not available and Mr. Wilkinson is in Birmingham —
 "BY THE COURT: Let me see if I can get Mr. Taylor's file from his family, if he still has it. I don't know if I can or not.
 "BY MR. ADAIR: As I understand what you're saying, you want their trial preparation materials. Is that what you're saying?
"BY MR. COHEN: That's correct.
 "BY MR. ADAIR: Well, we don't have any objection to their having any of that at all.
 "BY MR. COHEN: In the alternative — I've tried a goodly number of cases, best of scenarios, including trials, especially if it adds up big from defense's standpoint — documents get waylaid, they are missing — I don't know. My concern is, I don't know what may or may not be intact or missing from Mr. Wilkinson's file or Mr. Taylor's file.
 "What I request with a view toward resolving the issue now rather than down the road, if the prosecutor's office could put together another packet of materials. I realize it is voluminous.
"BY MR. ADAIR: That's possible but —
 "BY THE COURT: I see what we are going to have to do is sit down and compare notes with calendars and try to put together that which we don't have. It is going to take a good little while to do that, like a day's work, seems to me."
Supplemental Record filed December 26, 1991, at 9-12 (transcript of September 4, 1991, hearing).
Contained in the original record on appeal is the "District Attorney's Evidence Log.* " R. 1056. On the title page of that document appears the following: " *Includes every item of evidence as received from investigators and denotes that each was given to the defendant or the Court by the actual party's initials." R. 1056 (emphasis in original).
10. "[T]ape recordings of the trial proceedings as recorded by the court reporter." The trial judge specifically denied this request by appellant's counsel: "The electronic recording is done with the court reporter as a backup. It is not my practice to allow tapes to be turned over. It opens too many doors. I deny that motion unless you can supply me so law." Supplemental Record filed December 26, 1991, at 14 of transcript of hearing held on September 4, 1991.
11. "[V]oir dire of the jurors who were separated and taken for an emergency room visit during the trial." There is no mention of or reference to this matter in the transcript of the trial and sentence proceedings.
This matter first appears at the hearing held on September 4, 1991. At that hearing, in response to a request by the appellant's counsel for information on this matter, the trial judge stated:
 "As I recall there were no notes. We had two heart patients on that [jury], unbeknownst to anyone, and the bailiff and I can't remember whether it was at night or during the day, called me and said these, one at a time, that they were feeling bad and wanted to get permission to separate them and take them to the hospital. I gave verbal order to certainly take them to the emergency room and have them checked out.
 "The only writing done about that was in the [news]paper. I know I personally did not communicate with any juror, directly, after they were impanelled.
 "BY MR. COHEN: Do you recall whether or not counsel for defendant or counsel for the State —
"BY THE COURT: Communicated with the juror?
 "BY MR. COHEN: Communicated with them with respect to those two crises?
 "BY THE COURT: No, they did not. We were all concerned. But, every question that came from the jury to me, such as family visits and things of that nature, telephone calls and things of that nature, I gave verbal instructions to the bailiff on how to conduct or handle the jury."
Supplemental Record filed December 26, 1991, at 25-26 (transcript of September 4, 1991, hearing). *Page 955 
At that hearing, the prosecutor indicated that there had been no objection to this matter when the trial judge informed counsel for both parties about it during the trial. Supplemental Record filed December 26, 1991, at 28 (transcript of September 4, 1991, hearing). Attorney Cohen, although challenged by the prosecutor, did not make a proffer that this separation could have influenced the jurors' verdict. Id. at 28-29.
This matter is next mentioned at the hearing on the appellant's motion to supplement the record held on May 22, 1992:
 "BY MR. COHEN: . . . The second aspect has to do with the request I had made for the reconstruction hearing insofar as it relates to the testimony of — I believe there were two jurors who for a total of three occasions were taken to the hospital. It would require some brief voir dire of them, on the record. Perhaps the doctors and certainly the court officer who assigned them to the hospital and thanks to the court, I did have a chance to speak to the court officer the last time I was here.
"BY THE COURT: Who was that? Wanda Lansford?
"BY MR. COHEN: Yes.
 "My suggestion is the following, Judge. I'm going to be here for the next four or five days. I am involved in an investigation with respect to Mr. Hunt. It, also, touches upon the jury issue.
 "I would suggest to the court — I have spoken to the district attorney beforehand — that we set a firm date — . . . . I will use the next three or four days to wrap up whatever investigations are necessary and at that point, following that brief colloquy, that's it. We have resolved this phase of perfecting the appeal to the degree that we can."
Volume II of the Supplemental Record filed on May 29, 1992, at 5 (transcript of May 22, 1992, hearing).
The appellant was tried in June of 1990, before the adoption of Rule 19.4, A.R.Crim.P. The appellant's trial was governed by Temporary Rule 21, Ala.R.Crim.P.Temp., which reads, in relevant part, as follows:
 "(a) In all capital cases (criminal trials in which the defendant is charged with a death penalty offense), the court reporter shall take full stenographic notes of the arguments of counsel whether or not such is ordered by the judge or requested by the prosecution or defense. This duty may not be abrogated by the judge or waived by the defendant."
The Alabama Supreme Court addressed the issue of the absence of a full transcript for purposes of appellate review in Exparte Harris, 632 So.2d 543 (Ala. 1993):
 "Under Temporary Rule 21(a), there was no requirement that the voir dire examination of the jury be stenographically recorded; and the requirement that the court reporter take 'full stenographic notes' of 'the arguments of counsel' — which appeared in Temporary Rule 21(a) and also appears in the current Rule 19.4(a) — does not require the court reporter to transcribe every incidental discussion between counsel and the trial judge that occurs at the bench unless counsel so requests or the court so directs. Instead, the phrase 'arguments of counsel' refers to opening and closing arguments of counsel. See, e.g., Ex parte Godbolt, 546 So.2d 991 (Ala. 1987); Webb v. State, 539 So.2d 343 (Ala.Crim.App. 1987); Reeves v. State, 518 So.2d 168 (Ala.Crim.App. 1987); see Ala. Code 1975, § 12-17-275."
 "In this case, the items or statements omitted from the record were not transcribed because they occurred out of the hearing of the court reporter. However, Harris's trial counsel had moved the trial court to 'order the official court reporter to record and transcribe all proceedings in all phases [of the case], including pretrial hearings, legal arguments, voir dire and selection of the jury, in-chambers conferences, any discussions regarding jury instructions, and all matters during the trial and in support thereof . . .'; and the court had granted the motion. After granting the motion, the court had the duty to see that the entire proceedings were transcribed; we must conclude that the failure to record and transcribe a portion of the voir dire examination of the jury and certain *Page 956 
portions of the bench conferences, in light of the fact that Harris was represented on appeal by counsel other than the attorney at trial, constituted error. See Ex parte Godbolt, 546 So.2d 991 (Ala. 1987). Thus, the question becomes whether that error constituted reversible error.
 " ' "When, [as in this case], a criminal defendant is represented on appeal by counsel other than the attorney at trial, the absence of a substantial and significant portion of the record, even absent any showing of specific prejudice or error, is sufficient to mandate reversal. The wisdom of this rule is apparent. When a defendant is represented on appeal by the same attorney who defended him at trial, the court may properly require counsel to articulate the prejudice that may have resulted from the failure to record a portion of the proceedings. Indeed, counsel's obligation to the court alone would seem to compel him to initiate such disclosure. The attorney, having been present at trial, should be expected to be aware of any errors or improprieties which may have occurred during the portion of the proceedings not recorded. But when a defendant is represented on appeal by counsel not involved at trial [as in this case], counsel cannot reasonably be expected to show specific prejudice. To be sure, there may be some instances where it can readily be determined from the balance of the record whether an error has been made during the untranscribed portion of the proceedings. Often, however, even the most careful consideration of the available transcript will not permit us to discern whether reversible error occurred while the proceedings were not being recorded. In such a case, to require new counsel to establish the irregularities that may have taken place would render illusory an appellant's right to [have the reviewing court] notice plain errors or defects.. . .
 " ' "We do not advocate a mechanistic approach to situations involving the absence of a complete transcript of the trial proceedings. We must, however, be able to conclude affirmatively that no substantial rights of the appellant have been adversely affected by the omissions from the transcript. When . . . a substantial and significant portion of the record is missing, and the appellant is represented on appeal by counsel not involved at trial, such a conclusion is foreclosed. . . ." '
 "Ex parte Godbolt, 546 So.2d at 997. (Citations omitted; emphasis added.) (Quoting with approval United States v. Selva, 559 F.2d 1303, 1305-06 (5th Cir. 1977)).
 "We have carefully reread those portions of the record where each omission occurred and have reread the several pages before and the several pages after those omitted portions, to ascertain, if possible, the content and substance of the discussions not transcribed, so as to determine whether 'a substantial and significant portion of the record' is missing and to determine whether we could 'conclude affirmatively that no substantial rights of [Harris] have been adversely affected by the omissions from the transcript.' Id.
 "From this extensive review, and given the particular facts of this case, we have concluded that the untranscribed portions of the proceedings did not constitute 'a substantial and significant portion of the record' and we have 'concluded affirmatively that no substantial rights of [Harris] have been adversely affected by the omissions from the transcript.' Rather, we have concluded that the trial court's rulings related to certain omitted portions of the proceedings were adverse to the state and that the content or substance of the other discussions that occurred out of the hearing of the court reporter was general in nature and had no effect on the outcome of the case. We conclude, under the facts of this case, that the error in failing to ensure that the entire proceedings were transcribed was harmless. Therefore, Harris's conviction was properly affirmed.
 "We note for the Bench and Bar that our holding that the failure to ensure a complete transcript of the proceedings was harmless error is strictly limited to the facts of this case and to the record before us; we are not to be understood as holding *Page 957 
that in all cases such an error will be considered harmless. Rather, each case will be limited to and determined on its own facts." (Footnote omitted.)
In this case, the appellant has been represented by three different attorneys on appeal, none of whom were trial counsel. The appellant was represented at trial by attorneys Lewis Wilkinson and Hubert Taylor. The appellant was convicted in June 1990 and was sentenced in July 1990. On August 2, 1990, Charles Eugene Caldwell was appointed to represent the appellant on appeal. R. 959, 1070. On February 15, 1991, Stanley L. Cohen of New York (assisted by attorney Mira Gur-Arie) was permitted by the trial court to undertake legal representation of the appellant after Caldwell withdrew from representation. On April 30, 1993, Cohen requested that new counsel be appointed to represent the appellant. On May 21, 1993, the trial judge ordered "that counsel for the Defendant and/or former counsel for the Defendant, the Honorable Stanley L. Cohen, serve the District Attorney with notice of any and all supplemental records necessary to complete the record on appeal on this case and all necessary hearings or contemplated hearings necessary to establish the same." Supplemental Record filed June 9, 1993, at 27A. The record contains no response to this order filed by Cohen or any other attorney for the appellant.
On June 2, 1993, Massey Relfe, Jr., the attorney who filed the appellate brief in this case and who is presently representing the appellant, was appointed to represent the appellant. Supplemental Record filed June 9, 1993, at 28. NoJackson motion seeking an extension of the time for filing a motion for a new trial pursuant to the procedures outlined inEx parte Jackson, 598 So.2d 895, 897-98 (Ala. 1992), was filed.
We have undertaken the conscientious and extensive review required in Ex parte Harris, supra. That review leads this Court to conclude that "the untranscribed portions of the proceedings did not constitute 'a substantial and significant portion of the record' and we have 'conclud[ed] affirmatively that no substantial rights of [the appellant] have been adversely affected by the omissions from the transcript.' " Exparte Harris, 632 So.2d at 546. That review convinces this Court that a large portion of the material with which the appellant sought to "supplement" the transcript on appeal was not "missing" from the record because the proceedings not included in the transcript were not required to have been transcribed initially. It appears that appellate counsel were attempting to "preserve error" where no objection had originally been made. It further appears that the appellant's motions to supplement the record more often resembled attempts to "retry" the appellant rather than efforts to correct the record to reflect what actually occurred.
 XVI
The appellant contends that the trial court erred in failing to instruct the jury on voluntary intoxication.
In his oral instructions to the jury, the trial judge instructed the jury on intentional murder and felony murder as lesser included offenses of the capital crimes charged in the indictment. Defense counsel raised no objection to those particular portions of the oral charge and, on one occasion, announced "satisfied." R. 881, 882, 888. The trial judge repeatedly instructed the jury on the definition of intent and the requirement that the killing have been intentionally committed. Although there was evidence that the appellant had consumed alcohol and drugs shortly before the murder, the trial judge was not requested to and did not instruct the jury on the legal principles of intoxication in connection with criminal liability. No objection was made at trial to the court's failure to give such an instruction.
In Fletcher v. State, 621 So.2d 1010 (Ala.Cr.App. 1993), the trial court did not instruct the jury on the legal principles of intoxication and this Court found that that omission constituted plain error. In Fletcher however, the trial judge, sua sponte, stated at the close of the State's case that he would not give a charge on intoxication because he " 'did not get the impression from the evidence that [the defendant] was so intoxicated that he didn't know what he was doing.' "
 *Page 958 
621 So.2d at 1018. We held that this determination by the trial court "invaded the exclusive province of the jury,' " id. at 1021, and, under the particular facts involved, amounted to plain error.
In contrast, in the instant case, the matter of an intoxication charge was not raised by anyone at the guilt phase of the trial. In fact, defense counsel objected to the references during the trial to the appellant's drug use and, in addition to the appellant's defense that he did not commit the murder, defense counsel suggested during closing argument that, at most, the evidence supported a conviction of intentionalmurder only. Thus, it appears that the appellant's defense strategy was to convince the jury either that he did not commit the murder or that the killing was intentionally done, but without sexual overtones. There was no claim that he was unable to form the intent to kill because he was intoxicated. Where, as in this case, an intoxication instruction would conflict with defense strategy, there is no plain error in the trial court's failure to give such an instruction. Gurley v. State,639 So.2d 557, 560-61 (Ala.Cr.App. 1993).
 XVII
The appellant's conviction on the three counts charged in the indictment and his sentence of death did not violate rights against double jeopardy.
In Ex parte McWilliams, 640 So.2d 1015 (Ala. 1993), the defendant was convicted on three counts of capital murder: Count I charging murder made capital because it was committed during robbery in the first degree while armed with a deadly weapon; Count II charging murder made capital because it was committed during a robbery in the first degree in which defendant caused serious physical injury; and Count III charging murder made capital because it was committed during rape in the first degree. In that case, the Alabama Supreme Court found that the defendant's rights against double jeopardy had not been violated.
 "McWilliams claims that his Fifth and Fourteenth Amendment rights against double jeopardy were violated in that, he says, he was convicted three times for the same crime.
 "McWilliams was initially charged under a four-count indictment. Count I of the indictment charged McWilliams with the murder of Patricia Reynolds made capital because it was committed during a robbery in the first degree while McWilliams was armed with a deadly weapon. § 13A-5-40(a)(2); and see § 13A-8-41(a)(1). Count II charged McWilliams with the murder of Patricia Reynolds made capital because it was committed during a robbery in the first degree in which McWilliams caused serious physical injury to Patricia Reynolds. § 13A-5-40(a)(2); and see § 13A-8-41(a)(2). Count III of the indictment charged McWilliams with the murder of Patricia Reynolds made capital because it was committed during a rape in the first degree. § 13A-5-40(a)(3). Count IV of the indictment charged McWilliams with the murder of Patricia Reynolds made capital because it was committed during sodomy in the first degree. § 13A-5-40(a)(3). Count IV of the indictment was dismissed on the State's motion at the conclusion of its case-in-chief. The jury found McWilliams guilty of the three remaining charges in the indictment, and the court sentenced him to death.
 "In King v. State, 574 So.2d 921
(Ala.Crim.App. 1990), the defendant was prosecuted for the rape of his four-year-old daughter. The four-count indictment charged King with two counts of rape (sexual intercourse with a girl under the age of 16 and sexual intercourse with a female by forcible compulsion), and two counts of sexual abuse (sexual contact with a girl under the age of 16 and sexual contact with a female by forcible compulsion). King was convicted on all four counts. He received two life terms for the rape counts and two 20-year terms for the sexual abuse counts. All of the sentences were to run concurrently. King, 574 So.2d at 922. Concluding that King's four convictions and multiple sentences for the same act violated his right against double jeopardy, the Court of Criminal Appeals remanded the case to the trial court with instructions *Page 959 
to vacate three of the convictions and sentences.
 "King, however, is not apposite in the present case. In Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), the United States Supreme Court addressed the scope of the coverage of the Double Jeopardy Clause, as follows:
 " 'The Double Jeopardy Clause embodies three protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnotes omitted). The Blockburger [v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932),] test was developed "in the context of multiple punishments imposed in a single prosecution." Garrett v. United States, 471 U.S. 773, 778, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764 (1985).'
 "Grady, 495 U.S. at 516-17, 110 S.Ct. at 2090-91, 109 L.Ed.2d at 561. This Court has also held that the Double Jeopardy Clause of the Alabama Constitution, Art. I, § 9, applies only in the three areas enumerated above. Ex parte Wright, 477 So.2d 492 (Ala. 1985).
 "In this case, McWilliams was not prosecuted for the same offense after an acquittal; nor was he prosecuted for the same offense after a conviction. That is, he was not prosecuted twice for the same offense. Moreover, while in King the defendant received four separate prison sentences for the same offense, McWilliams has only been sentenced to die once and, indeed, can only be put to death once.
 "In the context of prescribing multiple punishments for the same offense, the United States Supreme Court has stated that 'the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.' Missouri v. Hunter, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983).
 "In the present case, it is clear that the jury knew that it was convicting McWilliams of murdering Patricia Reynolds only once. It is also clear that the jury knew that McWilliams's crime was made capital because his victim was murdered in the course of one robbery and one rape. We conclude, therefore, that the sentencing court has not prescribed a greater punishment than the legislature intended. Even if McWilliams's rights against double jeopardy had been violated by the two convictions of robbery-murder, the convictions for one count of robbery-murder and one count of rape-murder would remain;[4] and either of these would be sufficient to support a death sentence.
McWilliams has application here. See also Powell v. State,631 So.2d 289 (Ala.Cr.App. 1993) (murder during a burglary and murder during a robbery).
Although the appellant was convicted of three capital offenses, he was only tried once and was only once sentenced to death. His argument is without merit.
 XVIII
We reject the appellant's contention that he was denied his constitutional right to a speedy trial because he was not indicted until eight months after his arrest and because he was not arraigned on the indictment until 12 months after his arrest. Applying the principles of Barker v. Wingo,407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), we find no merit to the appellant's contention.
This argument, as well as a number of others we have addressed in this opinion, was only briefly "mentioned" by the appellant in his brief to this Court and were "argued" as a conclusion without supporting legal authority or citations to pages in the record on appeal. See appellant's brief at 18. As we have noted in other cases, "[t]his activity smacks of 'sandbagging,' which has been *Page 960 
strongly condemned by the Supreme Court in Murray v. Carrier,477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)." Haney v.State, 603 So.2d 368, 401 (Ala.Cr.App. 1991), affirmed,603 So.2d 412 (Ala. 1992), cert. denied, ___ U.S. ___,113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).
 XIX
As required by Rule 45A, A.R.App.P., we have searched the record for "any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court" and have found no error which "has or probably has adversely affected the substantial right of the appellant."
As required by Ala. Code 1975, § 13A-5-53, we have reviewed the propriety of the imposition of the death penalty and have determined that death is appropriate in this particular case. We have searched the guilt and sentence proceedings for "any error adversely affecting the rights of the defendant" and have found none. § 13A-5-53(a).
In sentencing the appellant to death, the trial judge found the existence of two aggravating circumstances: 1) the capital offense was committed while the appellant was engaged in the commission of or an attempt to commit burglary, Ala. Code 1975, § 13A-5-49(4); and (2) the capital offense was especially heinous, atrocious or cruel compared to other capital offenses, § 13A-5-49(8). See R. 1046-48.
The trial court found the existence of one statutory mitigating circumstance: the appellant has no significant history of prior criminal activity, § 13A-5-51(1). The trial court considered evidence of the nonstatutory mitigating circumstance that the appellant's childhood had been "wrought with misfortune," but rejected that as a mitigating circumstance. R. 1048-51.
Review of the record convinces this Court that those findings regarding the aggravating and mitigating circumstances are supported by the evidence.
In determining that death is the proper sentence in this case we find that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. § 13A-5-53(b)(1). Our independent weighing of the aggravating and mitigating circumstances indicates that death is the proper sentence. § 13A-5-53(b)(2). We find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. § 13A-5-53(b)(3).
A thorough review of the record has convinced this Court that the appellant is in fact guilty of the crimes for which he has been convicted, that he received a fair trial, and that death is the proper sentence. The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] Count I alleged intentional murder during the sexual abuse of a victim incapable of consent. See § 13A-6-66(a)(2). Count II alleged intentional murder during sexual abuse by forcible compulsion. See § 13A-6-66(a)(1). Count III alleged intentional murder during a burglary.
[2] The district attorney specifically identified the defense argument to which he is responding: "I want to answer a challenge first of all. . . . I want to answer a challenge that Mr. Taylor . . . made. . . . Mr. Taylor said, 'Mr. DA, why don't he tell you whose those pants are?" R. 843.
[4] "Because each of those crimes contains an element not contained in the other, there could be no possible violation of the prohibition against double jeopardy. Blockburger, supra; Exparte Haney, 603 So.2d 412 (Ala. 1992); Ex parte Henderson,583 So.2d 305 (Ala. 1991); Jackson v. State, 516 So.2d 726
(Ala.Cr.App. 1985)."